## STROMBERG MOTOR DEVICES CO. v. PARKER.

(Circuit Court of Appeals, Seventh Circuit. January 6, 1914.)

No. 2028.

PATENTS (§ 328*)—INFRINGEMENT—CARBURETER.
    The Perkins patent, No. 731,218, for a vaporizer for internal combustion engines, conceding its validity, *held* not infringed.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois; Arthur L. Sanborn, Judge.

Suit by the Stromberg Motor Devices Company against Leonard A. Parker. Decree for defendant, and complainant appeals. Affirmed.

For opinion below, see 204 Fed. 462.

Charles A. Brown, of Chicago, Ill., for appellant.

Hillary C. Messimer, of New York City, for appellee.

Before BAKER, SEAMAN, and KOHLSAAT, Circuit Judges.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

KOHLSAAT, Circuit Judge. Appellant filed the bill herein in the District Court to restrain infringement of claims 1 and 2 of patent No. 731,218, issued June 16, 1903, to O. B. Perkins for vaporizer for internal combustion engines. The claims read as follows, viz.:

. "A vaporizer, comprising a shell having air and oil supplies and a valve coacting therewith, two springs, and means for bringing one or both of said springs into action to resist the opening of the valve.

"A vaporizer, comprising a shell having air and oil supplies and a valve coacting therewith, two springs, and means for bringing one or both of said springs into action to resist the opening movement of the valve, said means comprising a member adapted to engage the springs to hold them engaged with the valve, and an adjustable screw for said member."

The District Court found there was no infringement and dismissed the bill for want of equity. Whereupon this appeal was taken.

"The prime object of the present invention," says the patentee, "is to provide a vaporizer in which the ratio of the air and fuel in the explosive mixture will remain the same, according to the adjustment of the vaporizer. This end I attain by certain special features of construction, the most prominent of which is the arrangement of two springs which by adjustment may be successively brought into action, so that when one spring is active the engine may be run at high speed and when both springs are active the supply of mixture will be choked or throttled, thus cutting down the speed."

The following is a reproduction of the one drawing of the patent:

At line 71 of page 1 of the specification it is said:

"In the operation of the invention, after the gasoline supply is adjusted, to run it full speed the screw $c$ should be moved upward, placing the spring $g$ under minimum tension, and thus the valve $b$ will be lifted at the very inception of the suction-stroke and the gasoline and air will be drawn into the cylinder throughout the whole of the stroke, thus attaining a maximum charge. This may be slightly decreased by increasing the tension of the spring $g$ without, however, bringing the spring $h$ into action; but to merely slow down or throttle the engine the screw $c$ and plate $f$ should be screwed down until the spring $h$ is placed under tension. This increased pressure on the valve $b$ will prevent the valve from lifting until a material part of the suction-stroke is traversed, and the result is that the cylinder will be charged only during part of the suction-stroke. The quality of the combustible mixture is, however, unchanged. It is by this means that I am able to vary the volume of the charge at will without in any way affecting its composition."

Both claims, it will be seen, call for air and oil supplies and a valve coacting therewith.

In the above drawing $a^4$ denotes the oil supply and $a^5$ the discharge passage thereof, $b$ indicates the valve which works on the seat $a^2$ and opens into the shell $a$, $a^1$ represents the air inlet. The stem $b^1$ of the valve $b$ is fitted to slide freely in the hollow lower end of the screw $c$ which works in the head $d$. The latter is threaded or otherwise

fastened in the top of the shell $a$ to close same and $e$ indicates a lock-nut working on the screw $c$ above the head $d$ so that the screw may be held firmly in place. On the screw $e$ is a shoulder $c^1$ and against this shoulder bears a preferably circular plate $f$; $g$ and $h$ indicate two spiral springs, the spring $g$ being of less strength than the spring $h$, the former always engaging both the valve $b$ and the plate $f$. The spring $g$ is normally active with regard to the plate $f$. The spring $h$, being shorter than the spring $g$, is supported on the valve $b$. By means of the screw $c$ the tension of spring $g$ may be increased, and the spring $h$ may be brought into engagement with the plate $f$, when both springs will become active.

The contention of appellant is that defendant's supplemental air supply device, taken in connection with certain features of the primary air and fuel supply of defendant's carbureter, constitutes infringement of the patent in suit. Defendant denies both the validity of the claims in suit and the alleged infringement thereof.

Assuming the patent to be valid, for the present purpose, does the record show infringement? The drawing of defendant's carbureter is here reproduced:

As will be seen, this device consists of a carbureter having a constant level gas supply $11$ leading to a needle valve $12$ controlled by the hollow metallic float $13$ in the float-chamber $10$, whereby the oil is automatically maintained at the level $a$-$b$ within the chamber $10$ and thence conducted to the oil nozzle $7$ through the passage $9$. By these means the oil remains below the outlet of nozzle $7$ so long as no air

is entering through the tube *8*. When air-flow occurs, the conical form of the interior of tube *8* leads to a diminution of pressure at the point of smallest diameter, and thus sucks the oil upwardly through the nozzle *7*. Here the oil is overtaken and aspirated by the air rushing up through the air inlet at the bottom into tube *8* and thence to the throttle. This carbureter also includes a second nozzle *14*, fed through the pipe *15*, located an inch or so higher up than the other. Inasmuch as the flow of gasoline out of the nozzle practically depends on the suction resulting from the speed of the engine, gasoline will flow out of the low nozzle at all engine speeds but will not commence to flow out of the high nozzle until a certain engine speed is reached, thus providing a more economical operation of the engine. An auxiliary air supply valve is shown at the right of the drawing. It consists of the valve *19* opening downwardly from the atmosphere into the central chamber between the tube *8* and the throttle. This valve is held elastically shut by the compression of spring *29*. It is otherwise free to move vertically under the influence of atmospheric pressure. Spring *29* is seated in the pocket *30* of the outward wall of the device and bears upwardly against the bottom of valve *19* which is guided in its vertical motion by the central rod *21*, and this in turn is supported in the yoke; its position in reference thereto being adjustable vertically by a rotation of the thumb-nut *24* which is held engaged with the yoke by the spring *26*. The yoke is also adjustable vertically by rotation in the screw thread *16* in the casing. Springs *26* and *34* control the two adjustments against accidental rotations. The tension of spring *29* is adjusted by the rotation of the yoke and valve seat. The stiffer springs *31* and *33* may by vertical adjustment of the rod *21*, by means of thumb-screw *24*, be brought into contact with valve *19*, which when closed, will ordinarily be resisted only by the light spring *29*, coming into contact with springs *31* and *33* seriatim as it opens more widely. The valve *19* responds more readily to the suction in the engine when under the control of spring *29* than when under control of either spring *31* or *33*, or of all three springs.

Comparing the two devices in suit, we find that by the terms of the claims in suit it is essential that the valve coact with the air and oil supplies. These latter are fed into the so-called shell through tubes or openings which are completely closed by the valve when resting in its seat. In appellee's primary device, the air and fuel supply pipes are always open into the shell and do not depend on or coact with any valve for admission to the so-called shell or mixing chamber. Their operation is practically controlled by the suction in the engine, just as is the case in the patent in suit after the valve *b* is opened. Appellee's so-called primary device is old in the art, but it is claimed by appellant that appellee's supplemental or auxiliary air supply device, taken in connection with the primary element of his carbureter, constitutes an infringement of the claims in suit. If the auxiliary element of appellee discloses a fuel and air supply coacting with the valve *19*, the claim of appellant would seem to be justified. But is there any such coaction? In the first place, the auxiliary device has no oil supply in itself. If there be anything corresponding to appel-

lant's fuel supply feature, it must be found in the so-called device of appellee. It will be seen that both the primary and auxiliary fuel supply tubes are supplied with air through the same constantly open inlet. It is conceded that it ordinarily requires greater suction power to drive the fuel from the auxiliary oil supply pipe than from the primary supply and that, as a rule, the former comes into use only when the latter in conjunction with the air supply is choked in its exit or otherwise becomes inadequate to relieve the vacuum in the engine, or supply the proportion of fuel and air required from time to time to the engine. There is no satisfactory evidence to show that the opening of the valve *19* in any way within the meaning of the claims coacts with the primary or auxiliary fuel supply or with both of them.

Appellant's expert Boettcher in answer to cross-question 56, speaking with reference to the device of the claims in suit, says:

"It is my opinion, however, that the flow of the gasoline depends upon the inrush of air, since it is this very inrush of air which satisfies the vacuum, rather than upon the direct application of the vacuum created by the engine."

And again, in reply to cross-question 60:

"Whether or not this vacuum which is produced before the valve is opened to admit air is sufficient to raise the oil in the passageway $a^5$ to the point of overflowing, I cannot say."

Appellant's expert Miller speaks of appellee's fuel openings *7* and *14* as openings through each of which fuel may flow under the suction of the engine into the mixing chamber. This witness further says that what appellee terms an auxiliary air supply has air and oil supplies, the air being supplied through valve *19* and the fuel supplied through nozzle *7* or *14* of the so-called primary vaporizer, and has also a valve *19* coacting with said air and fuel supplies and that it otherwise corresponds with claim 1 in suit. In answer to cross-question 47, whether in appellee's carbureter the flow of gasoline through the two gasoline inlets depends upon the partial vacuum created by the suction stroke of the engine, he says:

"Yes. The partial vacuum within the carbureter being that resulting * * * from the suction-stroke of the engine, and as modified by the position of the butterfly throttle, the action of the auxiliary air valve and the flow of air through the main air inlet * * * although the fact that there was a greater rush of air by the nozzle of the fuel openings might, in itself, tend to increase the flow of gasoline."

In answer to cross-question 19, "Are you able to say how much effect, if any, there would be upon the flow of fuel in defendant's device from the opening and closing of the valve *19* as shown in complainant's exhibit drawing of defendant's device?" appellee's expert answered, "No."

The ex parte experiments with appellee's device are of doubtful evidentiary force and by no means convincing. As will be seen, the expert evidence on this point is indefinite and theoretical.

Even if it be conceded that the fuel supply seemed to be accelerated after the opening of the valve *19*, it by no means follows

212 F.—27

that there must be the co-operation or coaction called for by the patent in suit between the oil supply nozzles, the auxiliary air supply, and the valve *19*. On the most favorable theory of appellant, the co-operation is indirect. The opening and closing, or partial opening and closing, of the valve *19* does not simultaneously affect both the air supply and the fuel supply. Mere acceleration of the flow of fuel from an otherwise constant supply, by means of aspiration, cannot be said to be the same as an absolute control of the means of supply. The matter involved in the claims in suit is a unitary machine or device in which the sources of supply of air and fuel are absolutely opened or closed by the positioning of the valve *b*.

It is appellee's contention that in its carbureters the gasoline nozzle and the main air intake constitute an ordinary vaporizer, and, because this vaporizer has a tendency to furnish an unnecessary quantity or proportion of fuel on higher speeds, the auxiliary air intake is provided, and is so constructed and adjusted that as the engine speed increases it will furnish additional and appropriate quantities of excess air to weaken the mixture and produce engine economy. Appellee's expert Reeve says that the function of the auxiliary air valve (of appellee's device) is "to supply that portion of air which is needed, in addition to that entering through the 'carbureter proper,' to adjust automatically the richness of the mixture to the needs of the engine under various conditions of operation, as nearly as possible. This it does, not by varying the amount of fuel in the mixture, but by varying the quantity of air with which the preliminary mixture furnished by the 'carbureter proper' is diluted to bring it to a proper strength." In this we concur. Inasmuch as appellee's fuel supply is always open to the influence of the suction of the engine, it follows that it cannot be regulated by adjustment, and that when the air supply is changed, by adjustment, necessarily the ratio of the fuel and air is changed in the mixture. Thus the amount of air is varied while the amount of fuel remains stationary. In case the springs regulating the valve *19* are so adjusted as to increase their tension to the degree that the resistance of the valve to the suction influence will be increased, there will result a higher vacuum in the carbureter chamber before the valve *19* will open. This increase in vacuum will increase the suction and produce a greater flow of fuel from the fuel inlets. This will decrease the percentage of the air supply, whereby it is apparent that a richer mixture is produced when the stiffer springs of the auxiliary device are brought into action than when only the weaker spring is used. Thus in appellee's auxiliary device increase of spring pressure tends to enrich the mixture for given speed, while the avowed object of the claims in suit is to produce a device which will vary the volume of the mixture by spring adjustment without varying the proportions thereof. If this be so, it is evident that there can be no coaction between the air and fuel supplies of appellee's carbureter and the valve *19* of the auxiliary air supply device within the meaning of the claims in suit. We find no physical evidence of coaction between appellee's supplementary air valve, and his air and fuel supplies, on the one hand, and on the other we find that in appellee's device the mixture supplied to the engine varies in the relative percentage of its parts with

relation to each other, whereas in appellant's mixture the volume so supplied is varied, but the quality must and does remain constant.

This difference in results clearly indicates that appellee's auxiliary air supply device is not the device of the claims in suit. Appellee's device does not therefore infringe that of the claims in suit, and the decree of the District Court is affirmed.